Slip Op. 09-89

# UNITED STATES COURT OF INTERNATIONAL TRADE

NATIONAL FISHERIES INSTITUTE,
INC., ET AL.,

        Plaintiffs,

        v.

UNITED STATES BUREAU OF
CUSTOMS AND BORDER
PROTECTION,

        Defendant.

**Before: Timothy C. Stanceu, Judge**

**Court No. 05-00683**

## OPINION AND ORDER

[Granting in part plaintiffs' motion for judgment upon the agency record and remanding for redetermination of prior determinations of limits of liability for plaintiffs' continuous entry bonds]

Dated: August 25, 2009

*Steptoe & Johnson LLP* (*Eric C. Emerson*, *Gregory S. McCue*, and *Michael A. Pass*) for plaintiffs.

*Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, *Barbara S. Williams*, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Stephen C. Tosini*); *Chi S. Choy*, Customs and Border Protection, United States Department of Homeland Security, of counsel, for defendant.

Stanceu, Judge:  Plaintiffs National Fisheries Institute, Inc. ("NFI"), a non-profit trade association, and twenty-seven of its members move, pursuant to USCIT Rule 56.1, for judgment upon the agency record against United States Customs and Border Protection ("Customs," "CBP," or the "Agency").  Pls.' Mot. for J. on the Agency R. 1 ("Pls.' Mot.").  Plaintiffs claim that Customs contravened statutory provisions in imposing a new and more stringent bonding

requirement (the "enhanced bonding requirement") on importers of certain shrimp products that are subject to antidumping duty liability. *See* Mem. of P. & A. in Supp. of Pls.' Mot. for J. on the Agency R. 1, 3-16 ("Public Mem. of P. & A."). Plaintiffs also claim that Customs arbitrarily and capriciously applied its enhanced bonding requirement to shrimp importers without any basis for concluding that shrimp importers pose an increased risk of default, that Customs relied on formulas without considering factors specific to each importer, and that requiring shrimp importers to satisfy the enhanced bonding requirement is not a solution reasonably related to the problem of under-collection of antidumping duties. *Id.* at 17-23. The twenty-seven plaintiff importers contest individual bond sufficiency determinations in which Customs applied the enhanced bonding requirement to govern their continuous entry bonds. Pls.' Mot. 1.

The twenty-seven member plaintiffs are commercial importers of shrimp products that are subject to six antidumping duty orders issued by the United States Department of Commerce ("Commerce" or the "Department").[1] First Am. Compl. ¶¶ 1, 19. Earlier in these proceedings, in November 2006, eight of the twenty-seven member plaintiffs obtained a preliminary injunction. *Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs and Border Prot.*, 30 CIT 1838, 1842, 465 F. Supp. 2d 1300, 1305 (2006) ("*Nat'l Fisheries I*"). The twenty-seven member plaintiffs, in the

---

[1] The member plaintiffs include Admiralty Island Fisheries, Inc., d.b.a. "Aqua Star"; Berdex Seafood, Inc.; Censea Inc.; Crystal Cove Seafood Corp.; Eastern Fish Company, Inc.; Harbor Seafood, Inc.; Icicle Seafoods, Inc.; International Gourmet Fisheries, Inc., d.b.a. "Mid Pacific Seafoods"; Interocean Inc.; L.N. White & Co., Inc.; Mazzetta Company, LLC; McRoberts Sales Co., Inc.; Mseafood Corporation; Newport International; Ocean Cuisine International, an operating division of Fishery Products International, Inc., a wholly owned subsidiary of Fishery Products International Limited; Ocean to Ocean Seafood, LLC; Ore-Cal Corp.; Oriental Foods, Inc.; Pacific Seafood Group; Red Chamber Co.; Sea Port Products Corporation; Sea Snack Foods Inc.; Southwind Foods LLC, d.b.a. "Great American Seafood Imports Co."; Tampa Bay Fisheries, Inc.; Thai Royal Frozen Foods Co., Inc.; The Seafood Exchange of Florida; and The Talon Group LLC. *See* First Am. Compl., Attach. 1; Am. Form 13, Feb. 24, 2006.

memorandum supporting their Rule 56.1 motion, seek additional equitable relief. Arguing that Customs is statutorily precluded from considering antidumping duty liability in the determination of bond sufficiency, they urge the court to order Customs to allow replacement of their bonds with bonds for which the limit of liability is determined without regard to potential antidumping duty liability. *See* Public Mem. of P. & A. 4, 28-30. They also seek a permanent injunction to prohibit Customs from applying the enhanced bonding requirement to them in the future and from considering potential antidumping duty liability when setting the liability limits for their bonds. Pls.' Mot., Attach. 1 at 2-4 ("Pls.' Proposed Order"); *see* Public Mem. of P. & A. 30-31.

The court rejects plaintiffs' argument that Customs lacks any statutory authority whatsoever to consider potential antidumping duties when determining bond sufficiency but concludes, nevertheless, that the authority Customs possesses in this subject area is narrowly confined by the ministerial character of Customs' role in the administration of the antidumping duty laws. The court also rejects the government's argument that the enhanced bonding requirement, as related to the sufficiency determinations that Customs made on plaintiffs' bonds, is consistent with law. The court holds that the enhanced bonding requirement is arbitrary and capricious in imposing greatly increased bond requirements only on importers of shrimp products subject to antidumping duty orders. The court also holds that the enhanced bonding requirement is unreasonable in applying a formula that secures potential antidumping duties at a substantial amount over the required cash deposit. The court concludes that Commerce, as the agency to which Congress delegated authority to determine estimated antidumping duty liability, is required by law to set the cash deposit by estimating the final antidumping duty liability as accurately as possible. For these reasons, the court sets aside as contrary to law the contested

individual bond determinations that Customs made according to the enhanced bonding requirement and orders relief, in the form of a remand order, appropriate to this case.

## I. BACKGROUND

Background information is set forth in *National Fisheries I*, 30 CIT at 1843-47, 465 F. Supp. 2d at 1305-09, in which the court granted preliminary injunctive relief, and is supplemented below.

Directive 99-3510-004 (the "Bond Directive"), originally issued by Customs on July 23, 1991, established guidelines under which Customs port directors are to assess the adequacy of an importer's continuous entry bond. *See Monetary Guidelines for Setting Bond Amounts*, Directive 99-3510-004 (July 23, 1991), available at http://www.cbp.gov/linkhandler/cgov/trade/legal/directives/3510-004.ctt/3510-004.txt (last visited Aug. 24, 2009) ("*Bond Directive*"). Prior to the amendment by Customs in 2004, the Bond Directive set a non-discretionary, minimum continuous entry bond amount at $50,000 and established a formula by which "the bond limit of liability amount shall be fixed in multiples of $10,000 [or $100,000] nearest to 10 percent of duties, taxes and fees paid by the importer or broker acting as importer of record during the calendar year preceding the date of the [bond] application." *Id.* (setting forth formulas under "Activity 1 - Importer or Broker - Continuous"). Whether the bond limit was fixed in multiples of $10,000 or $100,000 depended upon whether the total duty and tax liability for an importer during the calendar year preceding its bond application exceeded $1,000,000. *Id.*

    A.  Modifications of the Bond Directive and Its Application to Shrimp Importers

Customs, on July 9, 2004, posted on its website an amendment to the Bond Directive (the "Amendment"), which set forth new formulas for calculating minimum continuous entry bond amounts.  *See Amendment to Bond Directive 99-3510-004 for Certain Merchandise Subject to Antidumping/Countervailing Duty Cases* (July 9, 2004), *available at* http://www.cbp.gov/xp/cgov/trade/priority_trade/revenue/bonds/07082004.xml (last visited Aug. 24, 2009) ("*Amendment*").  The Amendment was neither published in the Federal Register nor subjected to the established notice-and-comment procedures provided for under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 (2000).  Customs did not publish the Amendment in the Customs Bulletin.

The Amendment was the first issuance of several in which Customs set forth special bonding requirements for importers of agricultural and aquacultural merchandise that is subject to an antidumping or countervailing duty order.  The Amendment required all Customs port directors "to review continuous bonds for importers who import agriculture/aquaculture merchandise subject to antidumping/countervailing duty cases and obtain larger bonds where necessary."  *Amendment*.  A formula contained in the Amendment directed that "in fixing the limit of liability amount," port directors will calculate the product of an importer's antidumping or countervailing duty rate and the value of merchandise subject to antidumping or countervailing duties imported by that importer during the previous year.  *Id.* (setting forth the formula as the "[Commerce] rate at Order [multiplied by the] value of imports of merchandise subject to the case by the importer during the previous year").  The Amendment also applied

similar formulas to importers subject to provisional measures and to importers with no prior

history of importing agricultural or aquacultural merchandise.  *Id.*

In the Amendment, Customs cited an "increasing concern regarding the collection of

antidumping and countervailing duties, the impact of these collections on the amount of

disbursements pursuant to the Continued Dumping and Subsidy Offset Act (CDSOA or Byrd

Amendment) and continued vigilance by CBP to ensure collection of all appropriate antidumping

and countervailing duties."  *Id.*  Customs listed under-collections of antidumping duty liabilities

for imports of fresh garlic and crawfish as examples of why it deemed it necessary to change the

formula for determining minimum bond requirements.  *Id.*

On January 24, 2005, Customs posted on its website a document entitled "Current Bond

Formulas," which contained, *inter alia*, the formulas described in the Amendment.  *Current*

*Bond Formulas* (Jan. 24, 2005), *available at*

http://www.cbp.gov/xp/cgov/trade/priority_trade/revenue/bonds/pilot_program/ (last visited

Aug. 24, 2009) ("*Current Bond Formulas*").  The document, which was not published in the

Federal Register or Customs Bulletin, also stated that a "new comprehensive CBP Directive will

be issued at a later date."  *Id.*

In February 2005, subsequent to the issuance of the Amendment and Current Bond

Formulas, Commerce issued antidumping duty orders for certain frozen warmwater shrimp

("subject shrimp") from Brazil, China, Ecuador, India, Thailand, and Vietnam.[2]  Pursuant to the

---

[2] *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Brazil*, 70 Fed. Reg. 5143 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp From the People's Republic of China*, 70 Fed. Reg.

(continued...)

Amendment and Current Bond Formulas, Customs issued to all twenty-seven plaintiffs letters advising that their continuous entry bonds have been deemed insufficient under the Customs regulations, 19 C.F.R. Part 113 (2004), and required plaintiffs to obtain new continuous entry bonds with substantially higher limits of liability. *Nat'l Fisheries I*, 30 CIT at 1845, 465 F. Supp. 2d at 1307.

After the application of the Amendment to shrimp importers' bonds, Customs posted on its website a clarification to the Amendment of the Bond Directive (the "Clarification"), which established two classes of merchandise, "Special Categories" and "Covered Cases." *See Clarification to July 9, 2004 Amended Monetary Guidelines for Setting Bond Amounts for Special Categories of Merchandise Subject to Antidumping and/or Countervailing Duty Cases* 3 (Aug. 10, 2005), *available at* http://www.cbp.gov/xp/cgov/trade/priority_trade/revenue/bonds/ (last visited Aug. 24, 2009) ("*Clarification*"). The Clarification was not published in the Federal Register or the Customs Bulletin and was not the subject of a notice-and-comment proceeding.

As announced in the Clarification, Customs would select Special Categories or Covered Cases and in doing so, Customs would consider several criteria. *Id.* at 3-4. "Special Categories of merchandise can be designated where additional bond requirements in the form of greater

---

[2](...continued)
5149 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Ecuador*, 70 Fed. Reg. 5156 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from India*, 70 Fed. Reg. 5147 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp from Thailand*, 70 Fed. Reg. 5145 (Feb. 1, 2005); *Notice of Am. Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Frozen Warmwater Shrimp From the Socialist Republic of Vietnam*, 70 Fed. Reg. 5152 (Feb. 1, 2005).

continuous entry bonds or other security, may be required." *Id.* at 3. The Clarification

designated only agricultural/aquacultural merchandise as a Special Category. *Id.* The

Clarification explained that "[t]he term Covered Cases refers to merchandise within a previously

designated Special Category where different standards or formulas for determining the bond

amount will be applied." *Id.* Antidumping and countervailing duty investigations and orders

pertaining to shrimp are the only Covered Cases that Customs designated as falling within the

agriculture/aquaculture Special Category. *See id.* The Clarification set forth criteria[3] that

Customs would consider in determining whether imports designated as Special Categories or

Covered Cases should be subject to increased bond requirements. *See id.* at 3-4.

The Clarification also established the procedure for "Notice, Timing and Appeal" of

increased bond demands made by Customs for importers of Special Category and Covered Cases

merchandise. *See id.* at 5. Importers are provided thirty days from the mailing of the

insufficiency notice to reply with a request for a lower bond amount and to present Customs with

---

[3] The Clarification lists the following criteria:
1. Previous collection problems concerning a specific case or industry involved;
2. The similarity to previous cases or industries experiencing uncollected revenue problems;
3. Whether the merchandise in question had very low duty rates or was duty-free prior to initiation of an antidumping or countervailing duty case;
4. The projected ability of the industry to pay future duty liabilities;
5. Low capitalization of the industry involved such that new or increased duty liabilities create increased risk;
6. Whether the industry involved is highly leveraged such that new or increased duty liabilities create increased risk;
7. Any other factors that are deemed relevant.
*Clarification to July 9, 2004 Amended Monetary Guidelines for Setting Bond Amounts for Special Categories of Merchandise Subject to Antidumping and/or Countervailing Duty Cases* 3-4 (Aug. 10, 2005), *available at* http://www.cbp.gov/xp/cgov/trade/priority_trade/revenue/bonds/ (last visited Aug. 24, 2009).

evidence supporting a lowering of the bond amount. *Id.* The Clarification stated that in

reviewing an importer's response, Customs will consider the factors in 19 C.F.R. § 113.13(b)[4]

and also any other relevant factors. *Id.* at 6. "To provide openness and consistency, this

clarification allows for the consideration of certain factors that are relevant for determining duty

risk and modifying the amount of the bond required. All relevant factors will be appropriately

weighed by CBP when exercising its judgment and discretion in setting the bond amounts." *Id.*

at 3.

In October 2006, more than a year after the issuance of the Clarification, and eight

months after plaintiffs had commenced their lawsuit on December 21, 2005, Customs published

a Federal Register notice (the "October 2006 Notice") "to provide additional information on the

process used to determine bond amounts for importations involving elevated collection risks and

to seek public comment on that process." *Monetary Guidelines for Setting Bond Amounts for*

*Importations Subject to Enhanced Bonding Requirements*, 71 Fed. Reg. 62,276, 62,276 (Oct. 24,

---

[4] The guidelines provide that Customs, in making a determination of the limit of liability on a continuous bond, should at least consider:

> (1) The prior record of the principal in timely payment of duties, taxes, and charges with respect to the transaction(s) involving such payments;
>
> (2) The prior record of the principal in complying with Customs demands for redelivery, the obligation to hold unexamined merchandise intact, and other requirements relating to enforcement and administration of Customs and other laws and regulations;
>
> (3) The value and nature of the merchandise involved in the transaction(s) to be secured;
>
> (4) The degree and type of supervision that Customs will exercise over the transaction(s);
>
> (5) The prior record of the principal in honoring bond commitments, including the payment of liquidated damages; and
>
> (6) Any additional information contained in any application for a bond.

19 C.F.R. § 113.13(b) (2008).

2006) ("*October 2006 Notice*").  The October 2006 Notice announced changes to the process

discussed in the Amendment and the Clarification and, although inviting public comment, made

the changes in the process effective upon publication.  *Id.* at 62,276-78.  Despite the changes,

Customs retained the same basic formulas for calculating limits of liability for the continuous

entry bonds required of importers of merchandise in Special Categories.  *Id.* at 62,277.  The

October 2006 Notice stated, however, that Customs will provide for public notice and comment

on the designation of new Special Categories, which designation would occur according to

specified criteria, and that Customs also would provide for public notice of the removal of a

designation.  *Id.*

The October 2006 Notice did not announce a change in the current designation of

aquaculture merchandise as a Special Category or the current designation of the shrimp

antidumping orders as Covered Cases, but it indicated that Customs no longer will designate

Covered Cases.  "CBP will continue to evaluate on an industry wide basis those types of

merchandise where additional bond requirements may be needed."  *Id.*  "However, because

importers are only affected when merchandise is subject to different bond requirements, CBP

will only designate Special Categories, that is, merchandise for which an enhanced bond amount

may be required."  *Id.*  The October 2006 Notice stated, further, that importers of Special

Category merchandise "will be offered the opportunity to submit information on their financial

condition related to the risk of non-collection for that importer and CBP will determine bond

amounts based on that information, the importer's compliance history and other relevant

information available to CBP."  *Id.*  The October 2006 Notice indicated that absent exceptional

circumstances, Customs will apply the formulas to determine the bond amounts where a submission has not been made by a principal in response to a notice from Customs. *Id.*

The October 2006 Notice reiterated much of the procedure for appeal first set forth in the Clarification. *Compare Clarification* 5-6 *with October 2006 Notice,* 71 Fed. Reg. at 62,278. Unlike the Clarification, the October 2006 Notice was published in the Federal Register. As did the Clarification, the October 2006 Notice procedure provides the principal with thirty days to respond and to submit evidence supporting a lower bond amount, including financial information relevant to the importer's ability to pay, such as financial statements and tax returns. *October 2006 Notice*, 71 Fed. Reg. at 62,278. Customs stated that it will consider this information along with the factors identified in the applicable Customs regulation, 19 C.F.R. § 113.13(b), in determining a new bond requirement. *Id.* This new bond requirement "will not take effect with respect to a principal until 14 days after the date of CBP's reply to the principal's response." *Id.* The October 2006 Notice indicated that Customs intends to exercise discretion in setting new bond amounts. "If CBP determines that the principal has a record of compliance with customs laws and regulations and that the principal has demonstrated an ability to pay, CBP may decide not to require an increased bond amount even though the principal imports Special Category merchandise." *Id.* However, the October 2006 Notice also stated that "[a]t any time after CBP determines a bond amount for a principal below that provided by the formula, if the principal fails to remain compliant with customs laws and regulations, CBP will recalculate the principal's bond amount in accordance with the formulas outlined in this notice." *Id.*

Considering the Bond Directive as modified by the Amendment, Current Bond Formulas, and Clarification and as applied to shrimp importers, the court in November 2006 granted a

preliminary injunction with respect to eight of the twenty-seven plaintiffs in this action. *Nat'l Fisheries I*, 30 CIT at 1842, 465 F. Supp. 2d at 1305. The court issued the injunction to maintain the *status quo* and limited the injunction to the eight plaintiffs who had testified before the court, on the ground that only those eight plaintiffs had demonstrated immediate, irreparable harm. *Id.* at 1883-84, 465 F. Supp. 2d at 1335-36. The court also ordered Customs to review, and modify as appropriate, the sufficiency determinations it had made on certain of the bonds of the eight plaintiffs addressed in the preliminary injunction order. *Id.* Since the issuance of that opinion and order, Customs and the parties have filed numerous motions and status reports and have participated in the court's status conferences.

### B. Procedural History Subsequent to the Issuance of *National Fisheries I*

After the ordering of the preliminary injunction, plaintiffs and defendant regularly updated the court through the filing of reports and motions, filing their first round of status reports with the court in December 2006. Status Report (Pls.), Dec. 4, 2006; Status Report (Def.), Dec. 4, 2006. Soon thereafter, as directed in the preliminary injunction order, defendant reported on the status of certain member plaintiffs with bonds for which the limit of liability was $1.5 million or greater. *See* Status Report in Resp. to the Ct.'s Inj., Jan. 26, 2007.

Plaintiffs then filed several motions to compel defendant to file status reports with respect to the continuous entry bonds of plaintiffs Mazzetta Company, LLC ("Mazzetta"), Ore-Cal Corporation ("Ore-Cal"), and Eastern Fish Company, Inc. ("Eastern Fish"). *See* Mazzetta Company LLC Mot. to Direct Def. to Provide Supplemental Status Report; Ore-Cal Corporation Mot. to Direct Def. to Provide Supplemental Status Report; Eastern Fish Company's Mot. to Direct Def. to Provide Supplemental Status Report. Customs objected that Mazzetta did not

obtain a preliminary injunction and therefore was not entitled to obtain review of its bonds. Resp. to Mazzetta's Mot. to Compel the Filing of a Supplemental Status Report 1-4. Regarding Ore-Cal and Eastern Fish, Customs objected, *inter alia*, that it was not obliged under the preliminary injunction to review bonds for which the term had expired. Resp. to Ore Cal's Mot. to Compel the Filing of a Supplemental Status Report 1-4; Resp. to Eastern Fish's Mot. to Compel the Filing of a Supplemental Status Report 5-8. In response to defendant's motion "to address a disagreement between the parties concerning the administration of the Court's preliminary injunction order," the court held a telephonic status conference. *See* Consent Mot. for a Telephonic Status Conference 1; Order, Feb. 26, 2007 (ordering that the court shall hold a status conference on March 2, 2007). Pursuant to matters discussed during the status conference, the court denied as moot all three of plaintiffs' motions to compel. Order, June 19, 2007.

On January 18, 2007, plaintiffs moved for judgment upon the agency record pursuant to USCIT Rule 56.1, which defendant opposed. Pls.' Mot.; Def.'s Resp. in Opp'n to NFI's Mot. for J. Upon the Admin. R. ("Def.'s Resp."). After the filing of plaintiffs' motion, the Southern Shrimp Alliance attempted to intervene on the side of defendant. Mot. to Intervene of Southern Shrimp Alliance. The court denied the motion, concluding that "intervention at this [late] stage of the proceedings would unduly delay or prejudice the adjudication of the rights of the parties." Order 1, Mar. 15, 2007.

The court held oral argument in April 2007. Oral Argument Tr., Apr. 17, 2007. In response to issues raised in the parties' pleadings and at oral argument, the court requested additional briefing regarding Reorganization Plan No. 3 of 1979 ("Reorganization Plan"), which the parties provided. *Letter from U.S. Ct. Int'l Trade to Eric C. Emerson, Steptoe & Johnson,*

*LLP and Stephen C. Tosini, U.S. Dep't of Justice* (Sept. 17, 2007); Br. in Resp. to the Ct.'s

Sept. 17, 2007 Letter, Oct. 31, 2007; Supplemental Br., Oct. 31, 2007; *see Reorganization Plan*

*No. 3 of 1979*, 44 Fed. Reg. 68,273 (1979) (effective as of January 2, 1980 under Exec. Order

No. 12,188 of January 2, 1980, 45 Fed. Reg. 989, 993 (1980)) ("*Reorganization Plan*").  In

March 2008, at defendant's request, the court held an *in camera* status conference on the record,

during which plaintiffs further clarified the nature of their cause of action.  Status Conference

Tr. (Confidential) 31-32, Mar. 28, 2008.  Plaintiffs stated that they "are challenging any bond

determination for the 27 plaintiffs in this case to the extent that those bond determinations were

made based on Customs' enhanced bonding practice."  *Id.* at 31.  Plaintiffs urged the court,

"should [it] conclude that the enhanced bonding practice is contrary to statute or that . . . it was

an unreasonable practice applied only to one product," to "take action with respect to all bond

determinations made for . . . [the] 27 plaintiffs."  *Id.* at 31-32.  Additionally, plaintiffs set forth

the status of plaintiffs' individual bonds, to which defendant did not object.  *Id.* at 6-27.

Plaintiffs later submitted additional information on plaintiffs' individual bonds.  Pls.' Submission

of Supplemental Information Requested by the Ct. During *In Camera* Proceedings on Mar. 28,

2008.  In this and other status conferences with the parties held during the course of this

litigation, counsel for the parties have informed the court of developments affecting this

litigation, including the status of the various continuous bonds on which the plaintiffs in this case

are the principals.  Some disputes between the parties concerning specific bonds have been

resolved during this process.  However, the parties continue to disagree concerning the

reasonableness of the liability limits pertaining to other of the plaintiffs' continuous bonds.  The

latter group of bonds consists principally or entirely of those bonds ("previous" bonds) that apply

to importations for past time periods but on which plaintiffs remain liable due to entries of subject shrimp that remain unliquidated.

Plaintiffs moved to supplement the first amended complaint in May 2008 to inform the court that two plaintiffs in this action had sold assets. Mot. to Supplement the First Am. Compl. 1-2. After a telephone conference in August 2008 with the court and defendant, plaintiffs withdrew their motion to supplement the first amended complaint. Order, Nov. 6, 2008. Plaintiffs then submitted, in October 2008, a status report regarding a sale of assets by one plaintiff and a motion to substitute a plaintiff. Mot. to Substitute Party; Status Report (Pls.), October 14, 2008. Defendant opposed the motion to substitute a party. Def.'s Resp. to Mot. to Substitute Parties 1-3. The court denied the motion to substitute without prejudice on grounds unrelated to defendant's opposition. *Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs and Border Prot.*, 32 CIT __, Slip Op. 08-136 (Dec. 17, 2008).

### C. Parallel Proceedings in the World Trade Organization

Earlier in 2009, Customs published a notice proposing to end the designation of shrimp subject to antidumping or countervailing duty orders as a special category or covered case subject to the "enhanced bonding requirement" ("January 2009 Notice"). *Enhanced Bonding Requirement for Certain Shrimp Importers*, 74 Fed. Reg. 1224 (Jan. 12, 2009) ("*January 2009 Notice*"). The notice states that Customs proposes to end the designation because "[a] recent World Trade Organization (WTO) Appellate Body Report has found that CBP's application of this requirement to shrimp from Thailand and India is inconsistent with U.S. WTO obligations." *Id.* at 1224. The Appellate Body Report resulted from requests in 2006 by India and Thailand that the World Trade Organization ("WTO") Dispute Settlement Body ("DSB") establish panels

to consider whether the application of the enhanced bonding requirement to importers of shrimp was inconsistent with the international obligations of the United States under the WTO agreements. *Id.* at 1225. In reports circulated on February 29, 2008, both panels concluded that the application of the enhanced bonding requirement was an impermissible action against dumping and did not constitute reasonable security. *Id.* India, Thailand, and the United States appealed certain findings. *Id.* The Appellate Body affirmed the panels' decisions that the amended bond directive as applied to importers of shrimp from India and Thailand did not result in a reasonable security requirement. *Id.* The United States indicated that it would comply with the recommendations and rulings of the DSB. *Id.* Customs therefore "propose[d] to comply with the recommendations and rulings of the DSB by ending the designation of shrimp covered by antidumping . . . duty orders as a special category or covered case subject to the requirement of additional bond amounts." *Id.* Customs also stated that "shrimp importers may request termination of existing continuous bonds pursuant to 19 C.F.R. [§] 113.27(a) and submit a new continuous bond application pursuant to 19 C.F.R. [§] 113.12(b)." *Id.* Customs explained that "[a]ny change to the designation of [shrimp] and the bond amounts required of importers of [shrimp] will be effective for entries made on or after the date of publication of the final notice." *Id.*

The court held a telephonic status conference with the parties after granting defendant's motion for leave to file a status report addressing the January 2009 Notice. *See* Order, Feb. 17, 2009; Status Report (Def.), Feb. 17, 2009. In the conference, counsel for defendant responded to the court's question concerning the Agency's intention regarding the various bonds that are the subject of this litigation. The court asked, specifically, if Customs intended to take actions that

could resolve the remaining disputes between the parties. Counsel for defendant clarified that the January 2009 Notice did not signify an intent on the part of Customs to consider terminating, and allowing substitution of, any bonds other than those on which importers of shrimp currently are importing merchandise. In the conference, the parties confirmed to the court that the liability limits on some continuous bonds for past periods of importations remained in dispute and that the current proposal by Customs, if implemented, would not resolve the remaining issues in this litigation. Therefore, the court is ruling on plaintiffs' motion for judgment upon the agency record.

On April 1, 2009, Customs published a second notice concerning its implementation of the Appellate Body decision ("April 2009 Notice"). *Enhanced Bonding Requirement for Certain Shrimp Importers*, 74 Fed. Reg. 14,809 (Apr. 1, 2009) ("*April 2009 Notice*"). Customs announced that it was ending the designation of shrimp subject to antidumping or countervailing duty orders as a special category or covered case subject to an enhanced bonding requirement. *Id.* Customs announced that it would permit importers to seek termination of current bonds but that it would take no action to alter the liability on bonds for previous terms. *Id.* at 14,811-12. Customs gave several reasons for refusing to apply retroactively its rescission of the enhanced bonding requirement. Customs mentioned its obligation to protect the revenue and ensure compliance with law; its reluctance to interfere with the contractual relationship between principals and sureties; its concern that the existence of two bonds for the same period could pose legal confusion and lead to court action between competing sureties, resulting in serious risk to the agency's ability to collect duties lawfully owed; and that the court, in *National Fisheries I*, did not order Customs to take any action on the previous bonds. *Id.*

## II. DISCUSSION

The court exercises jurisdiction under 28 U.S.C. § 1581(i) (2000), under which the cause of action generally is considered to arise under the APA. *See Motion Sys. Corp. v. Bush*, 28 CIT 806, 818, 342 F. Supp. 2d 1247, 1258 (2004), *aff'd per curiam*, 437 F.3d 1356 (Fed. Cir. 2006). In exercising jurisdiction in such cases under 28 U.S.C. § 1581(i), the court is to review the matter as provided in the APA, 5 U.S.C. § 706. 28 U.S.C. § 2640(e) (2000). In accordance with 5 U.S.C. § 706, the court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2006).

The court first addresses defendant's argument that the modifications of the Bond Directive and the individual bond sufficiency determinations made thereunder are matters committed to agency discretion by law. *See* Def.'s Resp. 15-21. The court concludes, contrary to defendant's argument, that the individual bond determinations that Customs made according to the enhanced bonding requirement are subject to judicial review under the APA "arbitrary, capricious" standard of review. Second, the court considers whether plaintiffs are correct that 19 U.S.C. § 1623 (2000), when read in conjunction with 19 U.S.C. §§ 1673e(a)(3) or 1673g(a) (2000), prohibits Customs from considering antidumping duty liability when setting limits of liability on continuous bonds because security for potential antidumping duty liability is specifically provided for in §§ 1673e(a)(3) or 1673g(a), which require posting of a cash deposit to secure estimated antidumping duties. *See* Public Mem. of P. & A. 3-9. The court concludes that these statutory provisions do not preclude Customs from considering potential antidumping duty liability exceeding the amount of the required cash deposit. The court concludes, however,

that in making actual bond sufficiency determinations under § 1623, Customs is constrained by the limitations of its ministerial role in the administration of the antidumping duty laws. Third, the court considers the competing arguments of the parties as to whether Customs acted in accordance with law in calculating the limits of liability in plaintiffs' continuous entry bonds according to the enhanced bonding requirement. *See id.* at 17-26; Def.'s Resp. 21-28. The court concludes that the bond sufficiency determinations at issue are not in accordance with law. The enhanced bonding requirement was arbitrarily and capriciously applied only to importers of shrimp subject to antidumping duties, and the bonding formula included in the Amendment and Clarification sought to secure antidumping duties greatly exceeding the cash deposits. Finally, the court considers defendants' various arguments against the court's ordering relief in this case, including the fact that the sureties who issued the continuous entry bonds at issue are not parties to this action. *See* Def.'s Resp. 28-30. The court rejects defendant's arguments, concluding that the court has the power to fashion a remedy that is appropriate to redress the Agency actions that have been shown to be contrary to law.

### A. Customs' Determinations Are Not Beyond APA Review as Actions "Committed to Agency Discretion by Law"

In *National Fisheries I*, the court concluded that plaintiffs had shown a likelihood of succeeding on the merits on their claim that Customs' actions in imposing on plaintiffs increased bond requirements pursuant to the Amendment and Clarification were arbitrary, capricious, or an abuse of discretion and therefore contrary to law. *Nat'l Fisheries I*, 30 CIT at 1864-75, 465 F. Supp. 2d at 1320-29. In reaching this conclusion, the court rejected defendant's arguments that the "arbitrary, capricious" standard of review did not apply. *Id.* at 1865-70, 465

F. Supp. 2d at 1321-25.  In again arguing this point, defendant repeats and augments the arguments it made previously.  The court again rejects defendant's arguments and concludes that the arbitrary, capricious standard of review applies to the administrative actions that are contested in this case.

Defendant argues that the contested modifications of the Bond Directive and bond determinations made thereunder fall within the category of actions committed to agency discretion under the APA and that, therefore, "[t]he standard of review applicable to the bond requirements at issue here is not the 'abuse of discretion' or 'arbitrary and capricious' standards contained in 5 U.S.C. § 706."  Def.'s Resp. 15.  Instead, according to defendant, "review is limited to whether: (1) CBP exceeded its statutory authority; (2) there was a constitutional violation; or (3) CBP violated its own regulation," and because none of these three scenarios arises, plaintiffs have no recourse under the APA or otherwise.  *Id.* at 16 (citing *Heckler v. Chaney*, 470 U.S. 821, 830-31 (1985)).  Defendant maintains that the statute is drafted in a way that provides no meaningful standard by which the court can judge the agency's exercise of discretion thereunder.  *Id.* at 18-21.  The court rejects defendant's argument concerning the applicable standard of review.

Defendant relies principally on *Heckler* in arguing that the contested bond determinations fall within the exception to APA review under which "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2) (2006); *see* Def.'s Resp. 15-18.  Defendant's reliance on *Heckler* is misplaced.  In *Heckler*, plaintiffs challenged the refusal of the Food and Drug Administration ("FDA") to conduct enforcement proceedings to stop the use of certain drugs as lethal injections in state death penalty proceedings, a use the FDA had not approved.  *Heckler*,

470 U.S. at 823-24.  The plaintiffs in that case requested that the FDA instruct prisons to halt the unapproved use, seize the drugs, and prosecute the persons involved.  *Id.* at 824.  The FDA refused, explaining that even were it to assume it has jurisdiction over the issue, it would not commence enforcement proceedings because such proceedings "[g]enerally . . . are initiated only when there is a serious danger to the public health or a blatant scheme to defraud."  *Id.* at 824-25 (internal quotation marks omitted).  The FDA perceived no such dangers in the state lethal injection laws, which it described as "duly authorized statutory enactments in furtherance of proper State functions."  *Id.* at 825 (internal quotation marks omitted).  The Supreme Court viewed the agency's declining to act as a decision committed to agency discretion, explaining that "recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement."  *Id.* at 831.  In contrast to *Heckler*, which arose from an agency's refusal to act, this case arose from actions Customs took as an exercise of its authority over importers.  In *Heckler*, the Supreme Court drew a pertinent distinction:

> [W]hen an agency refuses to act it generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect.  Similarly, when an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner.  The action at least can be reviewed to determine whether the agency exceeded its statutory powers.

*Id.* at 832 (citation omitted).

In *Citizens to Preserve Overton Park, Inc. v. Volpe*, the Supreme Court declined to hold an agency action exempt from APA review, stating that "the exception for action 'committed to agency discretion' . . . is a *very narrow* exception."  *Citizens to Preserve Overton Park, Inc. v.*

*Volpe*, 401 U.S. 402, 410 (1971) (emphasis added and footnote omitted). As the Court

explained, "[t]he legislative history of the Administrative Procedure Act indicates that [the

exception] is applicable in those rare instances where 'statutes are drawn in such broad terms that

in a given case there is no law to apply.'" *Id.* at 410 (quoting S. Rep. No. 79-752, at 26 (1945)).

The Supreme Court in *Overton Park* reasoned that the statute at issue, which gave paramount

importance to park protection and disfavored the use of public parkland for highway

construction, when viewed in the context in which it was enacted, *i.e.*, the relatively low cost of

building highways on public parkland due to the publicly owned right-of-way and the minimal

disruption of local residences and businesses, provided law to apply that was sufficient for

judicial review under the APA. *Id.* at 412-13.

        As in *Overton Park*, there is law for a court to apply in this case. Congress enacted

19 U.S.C. § 1623 among its various other measures that regulate, and collect revenue on,

imports. Under § 1623(a), "the Secretary of the Treasury may by regulation or specific

instruction require, or authorize customs officers to require, such bonds or other security as he, or

they, may deem necessary for the protection of the revenue or to assure compliance with any

provision of law, regulation, or instruction." 19 U.S.C. § 1623(a). The authority to require

bonds includes the authority to set bond conditions and limits of liability. *See id.* § 1623(b)(1).

The statute grants discretion to accept different types of bonds, including "term," *i.e.*, continuous,

bonds and consolidated bonds. *See id.* § 1623(b)(3)-(4).

        The discretion granted to the Agency by § 1623 is not boundless. Congress delegated

authority to require such bonds as Customs "may deem necessary" for the protection of the

revenue or to ensure compliance with law. *See id.* § 1623(a). Under the plain meaning of the

provision, Customs is not free to set bonding requirements so onerous as to be unjustified by the statutory purpose of ensuring compliance or securing collection of the revenue. Overly burdensome bond requirements are not "necessary" to the fulfillment of either of those two statutory purposes. Yet, defendant's arguments would suggest, contrary to the congressional intent of the APA as construed in *Overton Park*, that Customs could impose any bond requirements it desires, whether or not Customs adequately considered relevant factors, and be sustained upon judicial review so long as Customs does not exceed its discretion under 19 U.S.C. § 1623, which defendant views as sufficiently broad to justify all actions contested in this litigation. In this case, defendant advances a construction of 19 U.S.C. § 1623 and 5 U.S.C. § 701(a)(2) under which the Agency's bond determinations are, in a practical sense, unreviewable.[5]

The Court of International Trade previously has observed that Customs' bond determinations are reviewable. In *Hera Shipping, Inc. v. Carnes*, 10 CIT 493, 640 F. Supp. 266 (1986), the court granted summary judgment for Customs after rejecting plaintiffs' claim that Customs was required to conduct a full administrative hearing before increasing a bond amount. In upholding Customs' determination, however, the court cautioned that "[o]bviously, the power to set bonds can be abused to put people out of business without reasonable justification" and that such an "extreme possibility is guarded against by the requirement that the notice provide sufficient information as to the basis for the change to allow it to be challenged in court." *Hera*

---

[5] Customs itself has published guidelines on the exercise of its discretion under 19 U.S.C. § 1623 (2000). As set forth in the preceding footnote, the guidelines set forth several factors that Customs, in making a determination of the limit of liability on a continuous bond, should at least consider. *See* 19 C.F.R. § 113.13(b).

*Shipping, Inc.*, 10 CIT at 496, 640 F. Supp. at 269.  The opinion adds that "[i]t must be emphasized that a party is not entirely helpless when its bond is increased" and that "[t]he question of whether the increase was based on a reasonable belief as to the existence of the necessary justifying conditions will always be open, as will the reasonableness of the increase in relation to the objectives sought to be secured."  *Id.* at 497, 640 F. Supp. at 269.

Relying on *Webster v. Doe*, 486 U.S. 592, 600 (1988), defendant argues that "the 'protection of the revenue' standard is much like the 'necessary or advisable in the interests of the United States[]' standard that the Supreme Court concluded was 'drawn in such broad terms that in a given case there is no law to apply.'"  Def.'s Resp. 19 (quoting *Webster*, 486 U.S. at 599-600).  The Supreme Court in *Webster*, 486 U.S. at 599-601, considered the availability of APA review for an employee's discharge from the Central Intelligence Agency ("CIA") under section 102(c) of the National Security Act, which provides that "the Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States."  *Id.* at 594 (quoting section 102(c) of the National Security Act of 1947, 61 Stat. 495, 498, 50 U.S.C. § 403(c) (1982)).  The Supreme Court concluded that Congress, in enacting section 102(c), "meant to commit individual employee discharges to the Director's discretion, and that [5 U.S.C.] § 701(a)(2) accordingly precludes judicial review of these decisions under the APA."  *Id.* at 601.  The Supreme Court reached this conclusion based on the language of § 102(c), which the Court concluded "fairly exudes deference to the Director," and the structure of the National Security Act, which created the CIA and gave the Director of Central Intelligence the responsibility for protecting intelligence sources and methods from

unauthorized disclosure. *Id.* at 600-01. Other than the use of the words "deem" and "necessary," the court does not find in the language of 19 U.S.C. § 1623(a) enough that is in common with § 102(c) of the National Security Act to accept the premise of defendant's argument. The stated purpose of § 1623(a), *i.e.*, to provide for bonding requirements that are necessary for the protection of the revenue and to ensure compliance with law, guides a Customs officer's exercise of discretion to set the limit of liability on a continuous entry bond. Therefore, the breadth of discretion granted by 19 U.S.C. § 1623(a) is not analogous or comparable to that granted to the CIA Director under section 102(c) to discharge an employee engaged in critical national security functions whenever the CIA Director deems it "necessary or advisable in the interests of the United States." The court concludes instead that § 1623 provides law to apply when reviewing a bond sufficiency determination according to the "arbitrary, capricious" standard of review.

B. Customs Acted Unlawfully in Imposing the Enhanced Bonding Requirement on Plaintiffs

The court will review Customs' actions under the "arbitrary, capricious" standard of review. The standard of review is a narrow one under which the court is not empowered to substitute its judgment for that of the agency. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). In reviewing agency action under this standard, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416 (citations omitted). To uphold an agency action under this standard, the court must conclude that Customs articulated a "'rational connection between the facts found and the choice made.'" *Bowman*, 419 U.S. at 285 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Although the court will uphold a decision of less than ideal clarity if the court reasonably can

discern the agency's path, the court will not advance reasoning that the agency has not itself provided. *Id.* at 285-86. Agency actions are held to be arbitrary and capricious if the agency, *inter alia*, "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [offered an explanation that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Plaintiffs argue that Customs lacks the statutory authority to consider antidumping duty liability when determining the sufficiency of an importer's bond. They view the effect of several statutory provisions, 19 U.S.C. §§ 1623, 1673e(a)(3), and 1673g(a), as vesting in Commerce the sole authority to decide how to secure collection of antidumping duties. *See* Public Mem. of P. & A. 3-9. Plaintiffs maintain that 19 U.S.C. § 1673e(a)(3) limits to the cash deposit the security required of importers upon issuance of an antidumping duty order. *Id.* at 3. They also argue that the role of Customs under the antidumping laws is ministerial, citing legislative history, the Reorganization Plan,[6] and various precedents. *Id.* at 4-16. Plaintiffs argue, further, that the bond formulas under which the bond determinations were made are not reasonably related to the problem of under-collection of duties that Customs identified as the problem it sought to resolve. *Id.* at 22-23. Plaintiffs contend that Customs, in rigidly applying the formula in the Amendment, declined to exercise discretion and thereby acted arbitrarily and capriciously.

---

[6] Reorganization Plan No. 3 of 1979, 44 Fed. Reg. 69,273 (1979), transferred authority over antidumping and countervailing duty proceedings from the Department of the Treasury to Commerce. It was in effect as of January 2, 1980 under Exec. Order No. 12,188 of January 2, 1980, 45 Fed. Reg. 989, 993 (1980).

*Id.* at 20-22.  Plaintiffs submit, in addition, that Customs applied the modified Bond Directive to shrimp importers without any basis for concluding that shrimp importers pose an increased risk of default.  *Id.* at 17-20.

Defendant responds that the actions Customs has taken are within its statutory authority and that neither the cash deposit provisions of 19 U.S.C. §§ 1673e(a)(3) and 1673g(a) nor the Reorganization Plan precludes Customs from imposing bond requirements to protect the revenue generated by antidumping duties.  Def.'s Resp. 9-15.  Defendant points to the longstanding authority of Customs to administer "'provisions of law relating to raising revenue from imports, or to duties on imports,'" *id.* at 5-6 (quoting 19 U.S.C. § 66 (2000)), and argues that § 1623, an early version of which was enacted by Congress as part of the Tariff Act of 1930, Pub. L. No. 71-361, § 623, 46 Stat. 590, 759 (1930), specifically grants Customs expansive bonding authority to ensure the collection of revenue raised from imports.  *Id.* at 6-7 (quoting 19 U.S.C. § 1623).  In enacting the Homeland Security Act of 2002, defendant explains, Congress affirmed Customs' authority over the collection of antidumping duties through certain statutory provisions such as 6 U.S.C. § 211, which established Customs within the Department of Homeland Security, and 6 U.S.C. § 215, which conferred "customs revenue authority" upon Customs that includes "[a]ssessing and collecting customs duties (including antidumping and countervailing duties . . .)."  *Id.* at 6 (quoting 6 U.S.C. § 215(1)); 6 U.S.C. §§ 211, 215 (Supp. V 2005).

To the extent that Customs has construed statutory provisions, particularly 19 U.S.C. § 1623, in applying the enhanced bonding requirement, the court recognizes that an agency's interpretations of a statute may merit deference even where that interpretation does not issue from formal rulemaking or an adjudicative process.  *See Skidmore v. Swift & Co.*, 323 U.S. 134

(1944). The degree of deference accorded "to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (footnotes omitted) (citing *Skidmore*, 323 U.S. at 139-40).

In this case, Customs has not articulated clearly a construction of 19 U.S.C. § 1623 and related provisions of law in the context of the specific issues to be decided in this litigation. The Agency's issuances do not persuade the court that Customs, in taking the actions contested in this case, considered the appropriate factors and recognized the limitations on its authority. For reasons discussed in the remainder of this Opinion and Order, the court concludes that the individual bond sufficiency determinations at issue must be set aside under the applicable standard of review.

### 1. Section 623 of the Tariff Act Provides Broad Authority to Require Bonds to Protect the Revenue in Import Transactions

In *National Fisheries I*, the court concluded that plaintiffs had not shown a likelihood of success on the merits on their claim that the statute precludes Customs from considering potential antidumping liability in the sufficiency of a continuous bond. *Nat'l Fisheries I*, 30 CIT at 1862-64, 465 F. Supp. 2d at 1318-20. In reaching this conclusion, the court rejected plaintiffs' argument that 19 U.S.C. § 1623(a), by limiting Customs' authority to require importers to post bonds to "case[s] in which bond or other security is not specifically required by law," precluded Customs from requiring additional security for antidumping and countervailing duty liability because the collection of cash deposits for such circumstances is already provided for in

19 U.S.C. §§ 1671e(a)(3) and 1673e(a)(3). *Id.* at 1862-63, 465 F. Supp. 2d at 1318-19. The court reasoned that § 1623(a) primarily "addresses the matter of *when* a bond or other security may be required" and that while plaintiffs "would have the court construe the introductory phrase as a limitation on the authority of the Secretary and Customs to set the limit of liability of a term bond," the "only language in subsection (a) that specifically relates to the limit of liability of a term bond allows for bonds 'necessary for the protection of the revenue.'" *Id.* at 1863, 465 F. Supp. 2d at 1319 (quoting 19 U.S.C. § 1623(a)). The court explained, moreover, that the provisions of subsection (b) of § 1623 "appear to provide Customs considerable discretion in setting the requirements for term bonds so as to protect the revenue." *Id.*

In support of their motion for judgment upon the agency record, plaintiffs express the view that "the Court's reading of [19 U.S.C. § 1623] is too broad." Public Mem. of P. & A. 3. Plaintiffs augment their previous argument by pointing out that 19 U.S.C. § 1623(b)(1) "states that CBP has the discretion to establish the terms and conditions of bonds '[e]xcept as otherwise specifically provided by law.'" *Id.* (quoting 19 U.S.C. § 1623(b)(1)). Plaintiffs argue that "this provision must be read in conjunction with other acts of Congress that limit CBP's authority," *id.*, and that Customs therefore lacks authority to set the amount of bond with respect to potential antidumping duty liability because security for this liability is specifically set by 19 U.S.C. §§ 1673e(a)(3) and 1673g(a), which provide for a cash deposit in an amount determined by Commerce, not Customs. *See id.* at 3-9; Oral Argument Tr. 35, Apr. 17, 2007 (according to plaintiffs' counsel, plaintiffs, pursuant to 19 U.S.C. § 1623(b)(1) "are not arguing that no bond whatsoever is permissible . . . just that in setting the amount of that bond [Customs] cannot include potential antidumping duty liability."). Plaintiffs construe §§ 1673e(a)(3) and 1673g(a)

to mean that the cash deposit is the only security for antidumping duty liability that may be required of importers after issuance of an antidumping duty order.  Public Mem. of P. & A. 3-5.

In § 1673e(a)(3), Congress specified the contents of an antidumping duty order, providing as follows:

> (a) Publication of antidumping duty order
>     Within 7 days after being notified by the [International Trade] Commission of an affirmative determination under section 1673d(b) of this title, the administering authority shall publish an antidumping duty order which—
>         . . .
>         (3) *requires the deposit of estimated antidumping duties* pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

19 U.S.C. § 1673e(a)(3) (emphasis added).  Similarly, in § 1673g(a), Congress provided that:

> For all entries, or withdrawals from warehouse, for consumption of merchandise subject to an antidumping duty order on or after the date of publication of such order, no customs officer may deliver merchandise of that class or kind to the person by whom or for whose account it was imported unless that person . . . deposits with the appropriate customs officer an estimated antidumping duty in an amount determined by [Commerce].

*Id.* § 1673g(a).  Plaintiffs' argument correctly recognizes that under 19 U.S.C. §§ 1673e(a)(3) and 1673g(a), only Commerce, and not Customs, is empowered to set the cash deposit requirement based on the estimated antidumping duty, and that Customs has the role of collecting that cash deposit before releasing subject merchandise.  Plaintiffs' argument is unconvincing, however, in insisting that the introductory phrases in § 1623(a) and (b)(1) preclude Customs, when determining a bond amount, from requiring security to guarantee collection, upon liquidation, of any antidumping duties in excess of the cash deposit.  Nor do plaintiffs point to anything in §§ 1673e(a)(3) or 1673g(a) connoting that Congress intended the cash deposits

required thereunder to be the *sole* security that the government may require for potential

antidumping duty liability.

> Section 623(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1623(a), provides that

> [i]n any case in which bond or other security is not specifically required by law, the Secretary of the Treasury may by regulation or specific instruction require, or authorize customs officers to require, such bonds or other security as he, or they, may deem necessary for the protection of the revenue or to assure compliance with any provision of law, regulation, or instruction which the Secretary of the Treasury or the Customs Service may be authorized to enforce.

*Id.* § 1623(a). It is admittedly plausible to construe the introductory phrase in 19 U.S.C.

§ 1623(a), "[i]n any case in which bond or other security is not specifically required by law," to

mean that Congress intended to place entirely beyond the scope of the "bonds or other security"

authority conferred upon Customs by § 1623 any import transaction for which security is

required elsewhere in law. Such, however, is not the only plausible construction. It is at least

equally plausible to construe the introductory phrase such that potential antidumping duties

exceeding the cash deposit, which are not secured by §§ 1673e(a)(3) and 1673g(a), constitute a

"case" in which Customs may require additional security under subsection (a) of § 1623.

Moreover, legislative history casts doubt on plaintiffs' preferred construction of 19 U.S.C.

§ 1623. The House report associated with the enactment of Section 623 of the Tariff Act of 1930

explained the new provision as follows:

> In order to provide for more uniformity in these matters [*i.e.*, matters in the tariff laws pertaining to bonds] and for more elasticity in the requirements for bonds, there is included in the bill as section 623 a provision authorizing the Secretary of the Treasury by regulations to require or to authorize collectors to require such bonds or other security as he or they may deem necessary for the protection of the revenue and to assure compliance with the customs laws and regulations. A number of specific provisions of Titles III and IV requiring bonds in particular cases have been eliminated to correspond with this amendment. The new

provision will authorize the requirement of a bond wherever not specifically required by the law, but will not permit of the waiving of a bond where an express requirement occurs.

H.R. Rep. No. 71-7, at 186 (1929). The sense of the quoted passage is that Congress, in enacting § 1623, wanted to broaden the existing authority of Customs to require security to protect the revenue. There is no indication of an intent to narrow the scope of existing authority, and Congress made clear that the new statutory framework would authorize Customs to require a bond even if the law did not specifically require one. In also explaining that Customs could not waive a bond requirement where the law did require one, the passage indicates that along with providing Customs more discretion (as suggested by the reference to "elasticity in the requirements for bonds"), providing security for the collection of revenue was a primary congressional concern. The legislative history of § 1623 does not support plaintiffs' preferred construction of subsection (a) of that statute.

Nor does the court construe the introductory provision of subsection (b)(1) of § 1623 as precluding Customs, in setting the amount of a term bond, from considering potential antidumping duty liability. Subsection (b) of § 1623 provides that

> [w]henever a bond is required or authorized by a law, regulation, or instruction which the Secretary of the Treasury or the Customs Service is authorized to enforce, the Secretary of the Treasury may—
> (1) Except as otherwise specifically provided by law, prescribe the conditions and form of such bond and the manner in which the bond may be filed . . . and fix the amount of penalty thereof, whether for the payment of liquidated damages or of a penal sum . . . .
> (2) Provide for the approval of the sureties on such bond, without regard to any general provision of law.
> (3) Authorize the execution of a term bond the conditions of which shall extend to and cover similar cases of importations over such period of time, not to exceed one year, or such longer period as he may fix when in his opinion

> special circumstances existing in a particular instance require such longer period.

19 U.S.C. § 1623(b)(1)-(3). While plaintiffs correctly point out that the agency has wide discretion to set the conditions and form of a bond "[e]xcept as otherwise specifically provided by law," the court does not construe the provisions in the antidumping law that govern cash deposits as "specifically provid[ing]" the conditions and form of a bond used to secure potential antidumping duty liability that could exist *above* the cash deposit. Although Commerce, not Customs, determines the amount of the cash deposit under 19 U.S.C. §§ 1673e(a)(3) and 1673g(a), nothing in these provisions specifies that the cash deposit is the sole form of security that the government may require for potential antidumping duty liability following issuance of an antidumping duty order, such that bonding to guarantee payment of potential liability exceeding the cash deposit under 19 U.S.C. § 1623 is impermissible. When two or more statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. *Cathedral Candle Co. v. U.S. Int'l Trade Comm.*, 400 F.3d 1352, 1365 (Fed. Cir. 2005); *see County of Yakima v. Confederated Tribes & Bands of the Yakima Indian Nation*, 502 U.S. 251, 255-56 (1992).

Plaintiffs also cite legislative history from the Trade Agreements Act of 1979, which required collection of the cash deposit for estimated antidumping duties on entries made after issuance of an antidumping duty order. Public Mem. of P. & A. 5. Plaintiffs cite to language from the report of the Committee on Ways and Means accompanying the Trade Agreements Act, in which "Congress stated that it 'recognize[d] the effect that the requirement of a cash deposit of estimated duties may have on importers, particularly small businesses, and does not wish to

unduly burden those importers who have, in fact, taken steps to eliminate dumping.'" *Id.* (quoting H.R. Rep. No. 96-317, at 69 (1979)). Plaintiffs also argue that Congress understood that there was a risk that the cash deposit would be lower than the final antidumping duties owed and that therefore, "CBP's decision to make a policy decision contrary to congressional intent is improper." *Id.* at 8 (citing 19 U.S.C. § 1673f(b)(1) (2000)).

The legislative history to which plaintiffs cite does not compel the conclusion that Congress intended to preclude bonding to secure potential antidumping duties in excess of the cash deposits. In the Trade Agreements Act of 1979, Congress imposed the cash deposit requirement despite recognizing that requiring cash deposits might unduly burden importers who are not dumping. In changing the security measure from bonds to cash deposits, Congress could have provided by statute, or at least opined in the legislative history, that the cash deposit is, or should be, the only security required. Congress did neither. Moreover, the same House report on which plaintiffs rely identified a purpose for the new cash deposit requirement that is in addition to the purpose of security for the collection of antidumping duties. The Committee on Ways and Means expressed its belief that the then-current practice of allowing merchandise subject to an order to enter under a bond "does not sufficiently deter dumping. Rather, it provides an incentive to exporters and importers to delay in submitting the information necessary to form the basis of an assessment." H.R. Rep. No. 96-317, at 69. The Committee concluded that a cash deposit requirement would better ensure the cooperation of importers. *Id.* (stating "that the requirement of cash deposits will ensure that complete information will be submitted to the Authority in a timely manner").

Plaintiffs also rely on judicial precedent to support their argument that Customs lacks authority over security for antidumping duty liability. They argue that the Court of Appeals for the Federal Circuit ("Court of Appeals") and the Court of International Trade "have emphasized the importance of accuracy in setting this cash deposit rate." Public Mem. of P. & A. 5. In support, plaintiffs cite *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003), *Decca Hospitality Furnishings, LLC v. United States*, 30 CIT 357, 427 F. Supp. 2d 1249 (2006), *Decca Hospitality Furnishings, LLC v. United States*, 29 CIT 1504, 412 F. Supp. 2d 1311 (2005), and *Badger-Powhatan v. United States*, 10 CIT 241, 250, 633 F. Supp. 1364, 1373 (1996). *Id.* at 5-6. "Plaintiffs submit that this concern for accuracy is in part an expression of Congress's concern that U.S. importers not be unfairly and unduly burdened by excessive cash deposit requirements." *Id.* at 7. Accordingly, plaintiffs urge, any security required of importers to secure potential antidumping duties must be limited to the cash deposit rate. *Id.* Plaintiffs are correct that courts have noted the importance of cash deposits that are based on estimates of the antidumping duty liability that are as accurate as reasonably possible. *See Allegheny Ludlum*, 346 F.3d at 1373 (stating that "there is a clear congressional intent that cash deposit rates be as accurate and current as possible"); *Badger-Powhatan*, 10 CIT at 250, 633 F. Supp. at 1373 ("[T]he statutory scheme requires that estimated antidumping duties be as closely tailored to actual antidumping duties as is reasonable given data available to [the International Trade Administration, Department of Commerce] at the time the antidumping order is issued." (footnote omitted)). In addition, as discussed previously, Congress envisioned that the cash deposit requirement would serve the purpose of encouraging exporters and importers to submit complete information to Commerce in a timely manner, a purpose that is in addition to

the securing of payment of antidumping duties later determined upon liquidation. *See* H.R. Rep.

No. 96-317, at 69. Cash deposits that are inflated estimates of potential antidumping duty

prejudice foreign producers and exporters and U.S. importers, while improperly low cash

deposits do not serve the purposes Congress intended. Nevertheless, the cases plaintiffs cite do

not address the narrow question of whether Customs lacks any authority to address potential

antidumping duty liability when making a determination of the sufficiency of a continuous bond.

In summary, based on its consideration of the statutory provisions that plaintiff cites, *i.e.*

19 U.S.C. §§ 1623, 1673e(a)(3) and 1673g(a), the court concludes that these provisions, standing

alone, do not rule out the exercise of authority under § 1623 to secure potential antidumping duty

liability when a determination of bond sufficiency is made under § 1623. This conclusion,

however, does not resolve entirely the question that the court must address in applying the

standard of review to the administrative actions that are contested in this litigation. That

question is whether Customs acted in accordance with law in determining the limits of liability

on plaintiffs' continuous entry bonds according to the enhanced bonding requirement. For the

reasons discussed below, the court concludes that the contested bond sufficiency determinations

may not be sustained under the arbitrary, capricious standard of review.

2. Customs Is Confined by Its Ministerial Role under the Antidumping Laws

Even though the court is unable to agree with plaintiffs' argument construing 19 U.S.C.

§§ 1623, 1673e(a)(3) and 1673g(a), the court concludes that other points made by plaintiffs have

merit in the larger context of this case and relate specifically to the question of whether Customs

acted lawfully in exercising its bonding authority under 19 U.S.C. § 1623. Plaintiffs identify the

Reorganization Plan as demonstrating the "axiom that Customs' role in the antidumping duty

process is only ministerial." Public Mem. of P. & A. 10; *see Reorganization Plan,* 44 Fed.

Reg. 68,273. Plaintiffs submit that by transferring from the Department of the Treasury to

Commerce the responsibility for administration and enforcement of the antidumping duty law,

Congress divested the Treasury Department, and thereby Customs, of any authority over security

required for estimated antidumping duties. Public Mem. of P. & A. 10-12. Plaintiffs contend

that "Congress also expressed its desire to have a single political appointee responsible for the

administration of the antidumping duty laws" because Congress was displeased with the Treasury

Department's administration of those laws. *Id.* at 16. Plaintiffs quote legislative history related

to the Reorganization Plan, stating that the "reorganization places responsibility for the statutes

under an Assistant Secretary who will be appointed by the President, and confirmed by the

Senate. This will allow Congress to hold this Assistant Secretary directly responsible for the

administration of these laws." *Id.* (quoting S. Rep. No. 96-402, at 24 (1979)) (internal quotation

marks omitted). Defendant responds that the Reorganization Plan did not deny to Customs the

authority to set the amounts of liability on continuous entry bonds. Def.'s Resp. 13. Defendant

acknowledges that there was a "transfer of specific statutory functions" but asserts that this

transfer did not include the transfer of authority under 19 U.S.C. §§ 3, 66, or 1623. Def.'s

Resp. 13; *see* 19 U.S.C. § 3 (2000) (entitled "Superintendence of collection of import duties");

*id.* § 66 (entitled "Rules and forms prescribed by Secretary"); *id.* § 1623 (entitled "Bonds and

other security").

Plaintiffs are correct in their view that under the statutory scheme in general, and the

Reorganization Plan in particular, the role of Customs in effectuating the antidumping laws is

ministerial in nature. Section 5 of the Reorganization Plan provides, in pertinent part, as follows:

> There are transferred to the Secretary [of Commerce] all functions of the Secretary of the Treasury, the General Counsel of the Department of the Treasury, or the Department of the Treasury pursuant to the following:
>
> . . . .
>
> (C) section 303 and title VII (including section 771(1) of the Tariff Act of 1930 (19 U.S.C. 1303, 1671 *et. seq.*), except that the Customs Service of the Department of the Treasury shall accept such deposits, bonds, or other security as deemed appropriate by the Secretary, and shall assess and collect such duties as may be directed by the Secretary [of Commerce], and shall furnish such of its important records or copies thereof as may be requested by the Secretary incident to the functions transferred by this subparagraph.

*Reorganization Plan*, 44 Fed. Reg. at 69,274-75. However, the court does not agree with plaintiffs that the reference to bonds "as deemed appropriate by the Secretary" necessarily must be construed to mean that Customs is without any authority to consider potential antidumping duty liability when setting a limit of liability on a continuous bond pursuant to 19 U.S.C. § 1623, a section that the Reorganization Plan does not mention. From the text of the Reorganization Plan, the court concludes that the functions Congress did not transfer from the Department of the Treasury to the Department of Commerce, although not directed specifically to the determination of antidumping duties, nevertheless encompassed the collection of revenue generally, including antidumping duties. The Reorganization Plan did not provide that only Commerce was to have authority to require security for payment of all antidumping duties owed on an entry of merchandise subject to an antidumping duty order.

Plaintiffs also refer to a memorandum of agreement between Commerce and the Department of the Treasury to support their argument that the Reorganization Plan gave Commerce exclusive authority over security requirements for antidumping duties. Public Mem. of P. & A. 12-15 (quoting Treasury Decision ("T.D.") 85-145, 19 Cust. B. & Dec. 331 (1985)). Commerce and Customs concluded the memorandum of agreement set forth in T.D. 85-145

pursuant to the authority, *inter alia*, of the Reorganization Plan. *Id.* at 332. In the memorandum

of agreement, Commerce stated that "[u]nless specifically instructed by [Commerce] . . . to

accept another form of security or a cash deposit for estimated duties, [Customs] may accept, at

its discretion, any of the following forms of security for payment of estimated antidumping or

countervailing duties." *Id.* The memorandum of agreement then outlined four options by which

the two agencies agreed that Customs, unless instructed by Commerce to require "another form

of security or a cash deposit for estimated duties," would accept bonds (single entry or term) in

amounts sufficient to cover the estimated antidumping or countervailing duty, or both,

determined by the Secretary of Commerce. *Id.* The memorandum of agreement revised a prior

memorandum of agreement between the two agencies that was entered into on October 2, 1980,

and both memoranda sought to implement the Reorganization Plan. *Id.*; T.D. 82-56, 16 Cust. B.

& Dec. 224 (1982).

The context of both memoranda of agreement is that Customs will accept bonds to secure

estimated antidumping or countervailing duty liability as determined by Commerce. Neither

memoranda appears to contemplate that Customs will have occasion to make its own

determination of estimated antidumping duty liability and secure it with appropriate bonding.

Nevertheless, because the discussion of bonding in both memoranda is entirely in the context of

guaranteeing payment of estimated antidumping duty liability as determined by Commerce, the

memoranda also can be read to address only the specific situations, such as provisional measures,

in which bonds, as opposed to statutorily-required cash deposits, are permissible to secure the

estimated antidumping duty that Commerce determines. As such, the language in the two

memoranda that pertains to bonding can be interpreted to be directed to matters other than the

specific question of whether, and to what extent, Customs has authority under 19 U.S.C. § 1623 to secure antidumping duty liability *above* the statutorily-required cash deposit.

Nevertheless, the broad transfer of functions from the Treasury Department to Commerce by means of the Reorganization Plan evinces an intent that Commerce, not the Treasury Department or Customs, would exercise substantive responsibility as administering authority for the antidumping duty laws. Customs, exercising only a ministerial role, does not possess the general authority, or the necessary expertise, to make substantive determinations under those laws. Estimating potential antidumping duty liability requires various findings and determinations under those same laws and therefore must be considered to be a substantive responsibility rather than a ministerial one. In addition, courts have noted specifically the importance of cash deposits that are based on estimates of the antidumping duty liability that are as accurate as reasonably possible. *See Allegheny Ludlum*, 346 F.3d at 1373; *Badger-Powhatan*, 10 CIT at 250, 633 F. Supp. at 1373. The substantive role of Commerce under the antidumping laws, the ministerial role of Customs under those same laws, and the specific responsibility of Commerce to determine potential antidumping duty liability as accurately as possible in the form of the cash deposit cause the court to conclude that Customs acts unlawfully when its decisions under 19 U.S.C. § 1623 encroach on the substantive responsibility of Commerce to estimate that liability.

In deciding the issues in this case, the court need not, and does not, hold that the existence of potential antidumping duty liability could never be relevant, under any circumstance, to a bond sufficiency determination under § 1623. It could be envisioned, for example, that Customs might face an individual bond determination in which an importer has such a poor record of paying past

bills for duties that any bill in excess of the antidumping cash deposit, no matter how small, is likely to be dishonored. Even in this example, Customs would have to consider the financial circumstances of the particular importer in order for the Customs bond determination to be sustained upon judicial review. But this theoretical example is far different from the circumstances of this case, in which Customs took a broad regulatory action that it based on its own unqualified predictions of future antidumping duty liability stemming from an entire antidumping investigation and that affected all importers of the subject merchandise.

Based on its review of the Amendment, the Clarification, the administrative record in this case, and the individual determinations Customs made on the continuous bonds it required of the twenty-seven plaintiffs, the court concludes that these individual bond determinations are contrary to law when considered according to the arbitrary, capricious standard of review. The court concludes, first, that these determinations were impermissible because they were made according to the formula in Amendment and the Clarification, which requires generally that bond amounts for importers of subject shrimp be set at 100% of the duty that would have been owed on the value of subject imports made during the previous year, at the rate determined by Commerce at the time of issuing the order. The formula essentially requires security for twice the antidumping duty liability that is secured by the cash deposit. In applying this formula, Customs acted despite the determination of estimated potential antidumping duty liability by Commerce, the agency possessing the authority and expertise to make such an estimate. Second, Customs arbitrarily and capriciously imposed its heightened bonding requirement solely on U.S. importers of subject shrimp, even though Customs did not consider whether U.S. shrimp

importers pose a greater risk of defaulting on antidumping duties than U.S. importers of other

agricultural or aquacultural merchandise subject to antidumping or countervailing duty orders.

### 3.  The New Bond Formula, As Applied to Plaintiffs, Unreasonably Required 100% Bonding in Addition to the Cash Deposits

Under 19 U.S.C. § 1623, Customs may require continuous bonds in amounts it deems

"necessary for the protection of the revenue."  19 U.S.C. § 1623(a).  Customs must exercise this

discretion responsibly and in recognition of its ministerial role in the statutory antidumping

scheme.  Under the standard of review applicable in this case, Customs cannot be sustained in

bond determinations that are unnecessarily burdensome and disproportionate to the risk posed to

the public revenue.

Customs acted beyond the limits of its ministerial role in imposing on U.S. importers of

shrimp subject to antidumping duty orders, absent any direction from Commerce, an onerous

requirement for new bonds with greatly expanded limits of liability.  In setting individual bond

amounts for shrimp importers, including plaintiffs, Customs applied the formula in the

Amendment and Clarification, which called for bonds in amounts equivalent to 100% of the duty

owed on the value of each shrimp importer's merchandise, calculated according to the value of

the imported merchandise for the preceding year and the current assessment rates.  *See*

*Amendment*; *Clarification* 4-5.  Because the cash deposit is set at 100% of the duty that

Commerce estimates will be owing on the entry at the time of liquidation, the formula appears to

be based on the presumption of a risk that the duties owed upon liquidation will be

approximately twice the amounts estimated by Commerce.  *See Amendment*; *Clarification* 4-5.

Customs, in fact, stated in the Clarification that "[t]he amount of the continuous bond is intended

to reflect a reasonable amount necessary to cover the additional revenue risk not covered by cash deposits or other security." *Clarification* 2. However, as discussed previously, Commerce is required by law to estimate the future antidumping duty as reasonably as possible. *See Allegheny Ludlum*, 346 F.3d at 1373; *Badger-Powhatan*, 10 CIT at 250, 633 F. Supp. at 1373. Customs, despite its lack of substantive authority or expertise in the field of antidumping, nevertheless decided to require security to address a routine risk that Commerce would underestimate substantially the antidumping duties that would be owing upon liquidation. The court cannot sustain such a decision as a permissible exercise of the authority granted by § 1623.

In the Amendment, Customs offered various reasons for deciding to impose substantial increases in the bond requirements for importers of subject shrimp: (1) "increasing concern regarding collection of antidumping and countervailing duties, the impact of these collections on the amount of disbursements pursuant to the Continuing Dumping and Subsidy Offset Act (CDSOA or Byrd Amendment), and continued vigilance by CBP to ensure collection of all appropriate antidumping and countervailing duties"; (2) some importers subject to "a recent antidumping case on garlic" who "incurred a final liquidation rate of 376 percent" had insufficient bonds and were "unable to meet their financial obligations"; (3) recent antidumping cases for agriculture/aquaculture merchandise have resulted in considerable rate increases, for example "[i]n the case of crawfish, the deposit rate for most imports was 91.5 percent but was increased to 201 percent at final liquidation"; (4) "the time between entry of merchandise subject to antidumping cases and final liquidation can be 18 months or more," which is "significantly longer than importations of other types and therefore poses a greater risk to CBP for collection." *Amendment*. The Clarification essentially repeated these reasons in summary form.

*Clarification* 2. The Clarification also stated that "[t]he amount of the continuous bond is intended to reflect a reasonable amount necessary to cover the additional revenue risk not covered by the cash deposits or other security." *Id.*

In arguing that the court must uphold Customs' determination of increased bond amounts for shrimp importers, defendant contends that the agency "actions possess a rational basis with respect to the protection of the revenue." Def.'s Resp. 25-26 (stating that "rational basis" is "the only yardstick against which to compare CBP's actions"). Defendant maintains that requiring more security "is clearly a rational choice [on the part of Customs], as failure to require more security in the face of the facts would be error of judgment." *Id.* at 26. Quoting the Customs regulations at 19 C.F.R. § 113.13(b)(3), defendant argues that "all that CBP did was to set bond amounts based upon '[t]he value and nature of the merchandise involved in the transaction(s) to be secured.'" *Id.* at 28 (quoting 19 C.F.R. § 113.13(b)(3)). Characterizing as "clearly irrational" the arguments plaintiffs direct against the application of the bond formula, defendant maintains that "NFI members possess no protected right to import shrimp." *Id.* at 27.

Defendant's arguments are unpersuasive. The mere citation to the § 113.13(b)(3) factor of the value and nature of the merchandise involved in the transactions to be secured, which is general in nature, does not suffice as a rational basis for the specific decision by Customs to incorporate a 100% bonding requirement in its bond formula. Nor is it accurate for defendant to characterize plaintiffs' cause of action in this case as involving a "protected right to import shrimp." *See id.* Plaintiffs make no such argument. Plaintiffs had the right under 28 U.S.C. § 1581(i) and the APA to contest the Agency's bonding decisions that adversely affected them and, in so doing, to obtain judicial review according to the arbitrary, capricious standard.

Defendant's argument that it was rational and responsible for Customs to require more security appears to presume that the issue in this case is whether Customs is justified in imposing *some* increase in bonding requirements when an importer's particular situation makes it appropriate to do so. Defendant's argument overlooks the court's obligation to conduct a judicial review under the APA of the particular actions Customs took, which included imposing, through the formula, a 100% bonding requirement on plaintiffs through actions directed at the entire U.S. shrimp importing industry.

With respect to the risk that the cash deposits would not suffice, the record shows that Customs found that a large fluctuation in the dumping margin occurred in the crawfish case, with a rate increasing from 91.5% to 201.63%. *Periodic Risk Assessment of Material Risks in the Revenue Process* 1 (undated) (Admin R. Doc. No. 1) ("*Periodic Risk Assessment*"). Customs also concluded that the defaulting Chinese crawfish importers were "not heavily capitalized, allowing them to quickly enter and exit the business." *Id.* Customs concluded that importers' low capitalization posed two problems: importers could "easily close up shop and move on" to avoid unpaid duties, and importers had "little to no assets" for Customs to move against if the importer defaulted. *Proactive Approach to Revenue Prot. for Antidumping Duty, Comm'r Briefing* 2 (June 23, 2004) (Admin R. Doc. No. 9). The administrative record, however, provides no rational basis on which the agency could have concluded that these factors from the crawfish case apply broadly to other classes of importers or that these other importers (such as, in particular, U.S. shrimp importers) are particularly susceptible to bankruptcy, are likely to go out of business, or are operating as "sham" or "successor companies." *See Mem. from Comm'r to Assistant Comm'r, Office of Field Operations, and to Assistant Comm'r, Office of Strategic*

*Trade* 1 (Mar. 31, 2004) (Admin R. Doc. No. 7) (urging action to stop "Chinese exporters of agricultural products to evade anti-dumping duties") ("*Mem. from Comm'r*"); *Anti-Dumping Duty Collection* 7 (May 27, 2004) (Admin R. Doc. No. 8) ("*Anti-Dumping Duty Collection*").[7]

Another finding Customs made in its analysis of under-collection of duties involved the importing history of companies. *See Periodic Risk Assessment* 1. Examining the data in the crawfish from China case, Customs observed that 75% of the under-collected duties originated with companies that had been importing for a time period less than five years. *See id.* The record does not reveal a rational basis on which to extend such a finding to products other than crawfish and, in particular, to exporting countries other than China.[8] Customs applied the new bond formula to subject shrimp from all countries, not merely China, even though its own record revealed that importers of subject crawfish from China accounted for 65% ($85 million) of the total $130 million of uncollected antidumping duties. *CSDOA-FY2003 Uncollected Duties* 4 (undated) (Admin R. Doc. No. 3) ("*FY2003 Uncollected Duties*").

In summary, based on the record in this case, the reasons Customs put forth for its actions, and the limitations under which Customs performs its ministerial role under the

---

[7] The administrative record establishes that 25 current shrimp importers were participating in the Customs-Trade Partnership Against Terrorism ("C-TPAT"), which evidences a cooperative relationship between those importers and Customs in the war against terror. *Bond Sufficiency Review, Update for the CBP Modernization Bd.* 3 (Feb. 18, 2004) (Admin R. Doc. No. 6). Although participation in C-TPAT does not lend support to a finding relating to these importers' financial stability, such participation would have been relevant to a finding that these importers are not "fly-by-night" operations.

[8] Several of the plaintiffs that obtained preliminary injunctive relief have long histories of importing seafood and/or shrimp specifically, *e.g.*, Oriental Foods has been importing seafood since 1979 and Ore-Cal has been importing shrimp for the last 45 years. *See Nat'l Fisheries Inst., Inc. v. U.S. Bureau of Customs and Border Prot.*, 30 CIT 1838, 1852-54, 465 F. Supp. 2d 1300, 1312-13 (2006).

antidumping laws, the court concludes that Customs acted unlawfully in applying to the entire

shrimp importing industry (including plaintiffs) its burdensome 100% enhanced bonding

requirement.

### 4.  The Decision to Apply the Enhanced Bonding Requirement Only to U.S. Importers of Shrimp Subject to Antidumping Duty Orders Was Arbitrary and Capricious

The record shows that Customs concluded that targeting shrimp importers is "necessary

to insure sufficient 'safety net' bond coverage," noting that "75% of the current importers have

the minimum continuous bond of $50,000," that such bonds were sufficient previously, before

antidumping duties applied, and that this scenario "highlights how quickly the duty liability can

change." *Anti-Dumping Duty Collection* 6.  However, Customs did not base its regulatory action

on a finding that U.S. shrimp importers are less likely to pay their antidumping duties than are

importers of other agriculture/aquaculture products or importers of other products subject to

antidumping duties.  The court concludes that the decision by Customs to apply the 100%

enhanced bonding requirement only to U.S. importers of shrimp subject to antidumping duty

orders was arbitrary and capricious.

The decision to single out shrimp importers appeared to stem in part from the revenue

collection data for fiscal year 2003 showing that a single antidumping case, crawfish from China,

accounted for 65% of uncollected duties ($85 million of the $130 million in total uncollected

antidumping and countervailing duty bills). *FY2003 Uncollected Duties* 4.  Customs also

appeared to rely on the record information that the rate applied to subject crawfish from China

increased from 91.5% to 201.63% and that three-quarters of crawfish importers who did not pay

the additional duties owed on liquidation were importers with less than five years of import

history.  *Periodic Risk Assessment* 1.  The record data indicates that imports from a single country, China, accounted for 80% ($104 million) of the total $130 million of uncollected duties.  *FY2003 Uncollected Duties* 4.  The record further indicates that it was "the ability of Chinese exporters of agricultural products to evade anti-dumping duties" through "sham or alter ago successor companies" that was particularly troubling to Customs.  *Mem. from Comm'r* 1 (suggesting that Customs "vigorously engage[] the Commerce Department" on the issue).  Finding that crawfish imports from China posed an inordinate risk to the revenue, Customs apparently inferred that importers of all agricultural and aquacultural products share certain characteristics that make them less likely to pay duties assessed above the cash deposit.  *See Periodic Risk Assessment* 2 (in which Customs concluded that risks identified in the crawfish from China case – "large fluctuations in the dumping margins, and importers who enter and exit the importing business quickly" – apply to importers of agriculture and aquaculture products).  Thus, Customs apparently believed that importers of *all* agriculture and aquaculture products subject to antidumping or countervailing duties, from *all* countries, pose a high risk to the revenue.  Customs then made the choice to increase substantially the bonding requirements for only one group of U.S. importers–those who import shrimp subject to antidumping duties.

In defending Customs' actions, defendant identifies several of what it refers to as "relevant factors":

> (1) the final assessment of antidumping duties for agricultural and aquacultural merchandise had often greatly exceeded the estimated duties paid at time of entry; (2) importers of such merchandise were highly leveraged, preventing CBP from collecting the increased duties; (3) bonds that secured the importations were often the only recourse left to CBP; and (4) bonds calculated pursuant to the "ten percent rule" were insufficient to cover the increased duties.

Def.'s Resp. 26. None of the cited factors is specific to the U.S. shrimp importing industry or to any of the individual plaintiffs in this case. In that regard, defendant admits that "CBP never made a determination that shrimp imports posed more or less of a risk to the revenue than other agricultural/aquacultural products." *Id.* at 21. Defendant's admission highlights the arbitrariness of the decision to single out the U.S. shrimp importing industry as the target for greatly expanded bonding requirements. Defendant attempts to qualify or explain its admission, adding that "CBP elected to first target its enforcement efforts upon a single product." *Id.* Defendant's attempt to cast that decision as an exercise of enforcement discretion is unavailing. The action Customs took is not in the nature of a decision to direct or allocate agency resources in endeavoring to enforce an existing regulatory requirement. Instead, Customs put in place a new, and far more burdensome, regulatory requirement and ordered its port directors to effectuate it upon the review of all bond determinations of U.S. importers of subject shrimp.

Even where, as here, an agency's regulatory discretion is relatively broad, "'reasonable-ness' cannot cover for arbitrary or capricious action." *See Beardmore v. Dep't of Agric.*, 761 F.2d 677, 679 (Fed. Cir. 1985). Absent from the decision-making was a rational connection between the choice to single out the U.S. shrimp importing industry for imposition of a strenuous new bonding requirement and any risk to the revenue that was unique to that industry. Customs thus failed to address what was, in the words of *Bowman* and *Overton Park*, one of the "relevant factors." *See Bowman*, 419 U.S. at 285; *Overton Park*, 401 U.S. at 416. Unquestionably, the risk to the revenue arising uniquely from the shrimp importing industry stood as an important factor for Customs to consider; it related to the scope of, and the justification for, the entire

action. Yet, as defendant admits, that factor played no part in the decision by Customs to proceed as it did.

Instead, it appears from the record that the decision to single out shrimp importers was motivated entirely by considerations *other than* any unique risk to the revenue that such importers actually posed. The administrative record includes an internal Agency presentation from May 2004, in which the prospect of new bonding requirements for shrimp importers (which actually were imposed, beginning in July 2004) was described as "a proactive and prospective approach for the purpose of reducing the potential revenue write-off exposure." *Anti-Dumping Duty Collection* 8. The presentation stated that it experienced revenue write-off exposure in cases other than shrimp but explained that the proposal called for "shrimp as a first shot at this" because Customs had "built a strong risk based case that provides a strong, defensible position for why [Customs is] taking these actions." *Id.* The presentation recognized that shrimp importers would complain but expressed the belief that Customs would have the support of the domestic industry and the members of Congress who had been urging action on uncollected duties. *Id.* The agency noted that the Ad Hoc Shrimp Action Committee, which is the petitioner in the shrimp antidumping investigations and represents the interests of the domestic industry, is comprised of shrimp producers located mainly in Alabama, Florida, Louisiana, Mississippi, North Carolina, South Carolina, and Texas and that members of Congress from these states sit on several committees that have an interest in Customs. *Id.*

In another record document, Customs addressed the potential political repercussions of its taking action on shrimp importers' bonds. Customs explained that in applying the new bond requirements to shrimp importers, Customs would demonstrate to Congress that Customs was

proactive in addressing congressional concerns about the under-collection of antidumping duties, particularly from Southeast Asia. *Mem. from Deputy Comm'r to Comm'r* 3 (undated) (Admin R. Doc. No. 14) (explaining that the intensity of scrutiny regarding Customs' under-collection of duties results from the Continued Dumping and Subsidy Offset Act of 2000, Pub. L. No. 106-387, §§ 1001-1003, 114 Stat. 1549A-72-1549A-75 (2000), which gave the domestic industry a stake in the duties collected upon liquidation). Customs also anticipated the support of the domestic industry, explaining that "domestic petitioners in this case are from south and southeastern states that have congressional representation on committees that include the Subcommittee on Homeland Security, International Trade, House Ways & Means, Appropriations, Small Business Affairs, and the Senate Finance Committee." *Id.* Customs then noted that the " [t]he impact on importers may also generate inquiries and interest from their congressional representatives" but that "[t]he importers are not as geographically concentrated" even though importers' congressional representatives sit on all of the same committees as those of the domestic industry. *Id.* at 4 (observing that "three states that account for over 50 percent of the imports of shrimp are also the home to domestic petitioners for the case").

In summary, Customs chose to impose greatly expanded bonding requirements on the U.S. shrimp importing industry even though, as defendant admits, Customs had no reason to believe that shrimp importers posed any greater risk to the revenue than importers of other agricultural or aquacultural products. Despite defendant's attempt to cast such a choice as a permissible exercise of enforcement discretion, the court concludes that the Agency's decision to confine its broad regulatory action to the U.S. shrimp importing industry was arbitrary and capricious.

### C.  The Court Orders a Remand for Redetermination of the Bond Sufficiency Determinations Contested in this Case

With respect to existing bonds, plaintiffs seek an affirmative injunction directing Customs to permit each of the plaintiffs to "replace any existing continuous entry bond(s) with bond(s) calculated without regard to any potential antidumping duty liability."  Pls.' Proposed Order 1-2; Public Mem. of P. & A. 28-30.  With respect to existing and future bonds, plaintiffs seek an injunction prohibiting Customs from applying the amended Bond Directive "in determining the sufficiency of or in calculating any NFI Importer's continuous entry bond."  Pls.' Proposed Order 2-3; Public Mem. of P. & A. 30-31.  Plaintiffs further urge that, should the court conclude that Customs has authority to consider antidumping duty liability in determining bond limits of liability, the court must prevent Customs from doing so in an arbitrary, capricious, or unlawful manner.  Public Mem. of P. & A. 30.  Specifically, plaintiffs request that the court enjoin Customs from considering antidumping duty liability in determining bond amounts "until CBP can demonstrate that the NFI Importers, either alone, or in conjunction with other importers, present a heightened risk of default."  *Id*. at 31.

A remedy in the form of a remand is among the remedies that may be appropriate when a plaintiff succeeds in a cause of action that contests agency action.  As the Court of Appeals has noted, "the Court of International Trade has been granted broad remedial powers."  *Shinyei Corp. of Amer. v. United States*, 355 F.3d 1297, 1312 (Fed. Cir. 2004) (citing 28 U.S.C. § 2643 (2000)).  In 28 U.S.C. § 2643(c)(1), Congress provided, with exceptions not here applicable, that "the Court of International Trade may, in addition to the orders specified in subsections (a) and (b) of this section [referring to money judgments and certain forms of further administrative or

adjudicative procedures, respectively], order any other form of relief that is appropriate in a civil action, including . . . orders of remand." 28 U.S.C. § 2643(c)(1).

Based on its review of the entire record in this case, including the various status reports that provide information on, *inter alia*, actions Customs already has taken with respect to plaintiffs' continuous entry bonds, the court concludes that a remand proceeding, rather than entry of a permanent injunction, is appropriate at this time. In determining that a remand proceeding is now appropriate, the court does not reach any conclusion on the ultimate necessity for permanent injunctive relief and holds in abeyance any ruling on plaintiffs' motion for such relief. Nevertheless, a remand proceeding may obviate the need for a permanent injunction in the future by resolving expeditiously the remaining issues in this case. The court's review of the information in the various status reports on the administrative record of this case, which includes information on changes to the bonding status of the plaintiffs and the effect of administrative actions Customs has taken, indicates to the court that some of the issues giving rise to this litigation already have been resolved. Also, the court concludes from the record information, and from its taking judicial notice of the actions announced in the January 2009 Notice and the April 2009 Notice, that the most significant issue remaining to be resolved concerns the continuous entry bonds covering previous time periods on which a plaintiff is the principal but which have not been canceled because potential liabilities remain on entries that are unliquidated. A remand proceeding should allow this issue to be addressed by Customs, with the participation of plaintiffs, in an expeditious manner. The problem posed by these "previous" bonds is addressed below.

1.  The Actions Announced in the April 2009 Notice Do Not Correct the Unlawful Sufficiency Determinations for Previous Bonds

Future bond determinations and bonds on which plaintiffs currently are importing merchandise are affected by the regulatory actions that Customs announced in the April 2009 Notice.  However, the bonds on which the various plaintiffs remain the principals include not only those bonds on which a plaintiff currently is importing merchandise but also those bonds that covered previous time periods and in that sense might be described as "terminated" (but not canceled), on which a plaintiff will remain liable as principal until all entries made during the period covered by a particular bond have been liquidated and all duty obligations have been satisfied.  With respect to future bond determinations, Customs announced that it had "decided to end the designation of shrimp subject to [antidumping and countervailing] duty orders as a special category or covered case subject to the requirement of additional bond amounts for all countries." *April 2009 Notice*, 74 Fed. Reg. at 14,812.  With respect to current bonds, Customs announced in the April 2009 Notice that "on or after the publication of this notice, an importer with a current bond that was calculated using the [enhanced bonding requirement] may request termination pursuant to [19 C.F.R. § 113.27(a)] such that no further obligations would be charged against that bond." *Id.*  Customs also stated that "[s]hrimp importers may request termination of existing continuous bonds pursuant to [19 C.F.R. § 113.27(a)] and submit a new continuous bond application pursuant to [19 C.F.R. § 113.12(b)]." *Id.*  For existing bonds, CBP will enforce the bonds up to the date of termination, which will be no earlier than the effective date of this notice [April 1, 2009]." *Id.*

As did the January 2009 Notice, the April 2009 Notice announced that Customs would

grant no relief with respect to previous bonds for which liability limits were determined

according to the enhanced bonding requirement.  *Id.* at 14,811-12; *January 2009 Notice*, 74 Fed.

Reg. at 1225.  It gave as reasons its obligation to collect the revenue and ensure compliance with

law, its reluctance to interfere with the contractual relationship between principals and sureties,

legal confusion and possible court action between competing sureties resulting in serious risk to

the Agency's ability to collect duties lawfully owed, and the fact that the court, in *National

Fisheries I*, did not order Customs to take any action on the previous bonds.  *April 2009 Notice*,

74 Fed. Reg. at 14,811-12.  The April 2009 Notice alluded to an Agency policy, stating that

"CBP does not retroactively raise or lower bond security amounts that cover past customs

transactions."  *Id.* at 14,812.

<u>2.  On Remand, Customs Must Cancel the Bonds at Issue in this Litigation that Have Limits of
Liability Determined According to the Enhanced Bonding Requirement</u>

The court has the authority to order, as part of a remand, the cancellation of the bonds at

issue in this litigation.  The decision of the Court of Appeals in *Shinyei* illustrates the principle

that the Court of International Trade has the authority to order a remand that not only sets aside

the agency decision directly challenged by the plaintiff but that also affects related agency

actions, where declining to do so would render the relief meaningless.  *See Shinyei Corp. of

Amer. v. United States*, 355 F.3d 1297.  The plaintiff in *Shinyei* sought to have the Court of

International Trade declare unlawful certain liquidation instructions issued by Commerce that

affected the plaintiff's entries.  *See Shinyei Corp. of Amer. v. United States*, 27 CIT 305, 306, 248

F. Supp. 2d 1350, 1351 (2003), *rev'd* 355 F.3d 1297.  As a remedy, the plaintiff in *Shinyei* sought

a remand of the matter to Commerce so that it could obtain corrected liquidation instructions and also obtain reliquidation of the already-liquidated entries according to those corrected instructions. *Id.* at 306, 308, 312, 248 F. Supp. 2d at 1351, 1353, 1357. The Court of International Trade, concluding that the relief sought was unavailable because the entries had liquidated, dismissed for lack of subject matter jurisdiction. *Id.* at 314-17, 248 F. Supp. 2d at 1358-61. On appeal, the Court of Appeals reversed, holding that the relief sought is "easily construed as 'any other form of relief that is appropriate in a civil action'" and therefore available under 28 U.S.C. § 2643(c)(1). *Shinyei*, 355 F.3d at 1312 (quoting 28 U.S.C. § 2643(c)(1)). The Court of Appeals considered that available relief to include reliquidation of the entries in question. *See id.* at 1311-12 (refusing to hold that the Court of International Trade may not order reliquidation because to read such a prohibition into the statute "would preclude enforcement of court orders as to duty determinations as soon as entries subject to those orders are liquidated, even where liquidation was under erroneous instructions that fail to reflect the amended administrative review results implementing the courts' determinations").

Because of the enhanced bonding requirement, plaintiffs have been subjected to bond sufficiency determinations that they have demonstrated in this litigation to be contrary to law. These unlawful determinations cannot be allowed to stand. However, in exercising its duty to provide a remedy appropriate in this case, the court also must address the bonds that were obtained as a result of the unlawful bond sufficiency determinations. The setting aside of the unlawful bond sufficiency determinations, standing alone, is a hollow act that provides plaintiffs no remedy absent action taken on the underlying continuous entry bonds, including the previous bonds, which secure liabilities on entries occurring in past time periods. Throughout this

litigation, Customs steadfastly has refused to provide any relief as to these previous bonds, even though it has had multiple opportunities to do so during the course of this litigation and even though it now has discontinued the enhanced bonding requirement. The court, therefore, is ordering a remand under which Customs either must redetermine the limit of liability of each bond on which a plaintiff is the principal, for purposes of allowing a superseding bond, or, if Customs chooses, instead may cancel liability outright on a previous bond without requiring a superseding bond.

Defendant opposes plaintiffs' request that the court order replacement of bonds (including previous bonds), arguing that the court does not have authority to order replacement of a bond because the sureties are not party to this case and that the court could not compel a surety to underwrite the risk. Def.'s Resp. 29. Defendant also argues that replacing bonds is against sound administrative practice. *Id.* Customs advanced similar reasoning in its April 2009 Notice, stating that "[t]here are approximately 140,000 bonds currently on file with CBP. The possibility that each and every one of these bonds may be reconsidered and liability reassessed anytime after execution would cause administrative chaos." *April 2009 Notice*, 74 Fed. Reg. at 14,812.

Although Customs advances reasons for adhering in general to an established policy of refusing to "retroactively raise or lower bond security amounts that cover past customs transactions," *id.*, the court cannot allow any such policy, or considerations of agency convenience, to stand in the way of providing plaintiffs the relief to which they qualify, as a remedy for the unlawful agency determinations to which they were subjected. Moreover, the court is not convinced by the argument of defendant that the court lacks authority to order Customs to replace previous bonds because the sureties are not parties to this case and because

the court could not compel a surety to underwrite the risk. The remedy being ordered in this case will not require the court, or Customs, to compel a surety to underwrite a risk. On remand, Customs, if it chooses not to cancel a bond outright, must redetermine a limit of liability for a bond on which a plaintiff is a principal and allow replacement with a superseding bond at the new limit of liability, which must be determined lawfully according to the court's decision in this case. Thus, the plaintiff will be given the opportunity to obtain a superseding bond from a surety and tender that bond with Customs, which then must cancel the existing bond.

The government's argument that replacement of previous bonds is "contrary to sound administrative practice" is vague and unconvincing. *See* Def.'s Resp. 29. The continued refusal of Customs to address the problem of the previous bonds has resulted in inequitable treatment of long-time importers, such as plaintiffs, relative to new importers who were never subject to the unlawful enhanced bonding requirement. The agency's tolerating such a situation as this does not appear to the court to constitute "sound administrative practice." If, by citing "administrative practice," defendant is alluding to the underlying purpose of the bonds, the argument lacks merit because replacement of the previous bonds with superseding bonds need not adversely affect protection of the revenue or compliance with law. Even if the previous bonds were canceled absent *any* replacement (superseding) bonds, Customs would not be without a measure of security, in the form of cash deposits, for collection of the antidumping duties that Commerce estimated would be owing upon liquidation. With respect to ordinary customs duties, subject shrimp have been free of duty during the entire time period in which the antidumping duty orders have been in effect. Subheading 0306.13.00, Harmonized Tariff Schedule of the United States (2005). Concerning the matter of compliance with other laws, it is not likely that redelivery of

frozen shrimp would be ordered by the Food and Drug Administration for entries that occurred long ago, and in any event redelivery of a perishable food product would no longer be possible after such a period of time. *See* 19 C.F.R. § 141.113(c), (h) (2008) (setting forth a conditional release period and the general rule that Customs may order redelivery at any time prior to the time that liquidation of the entry becomes final). Concerning any possible interest of Customs in imposing liquidated damages for a failure to redeliver, in order to deter future noncompliance, the court is allowing Customs, under the remand order, to pursue that interest by requiring a superseding bond prior to canceling any previous bond, if it so chooses to take this action instead of canceling a previous bond without requiring a superseding bond.

   3. Bond Sufficiency Determinations Made Under the Enhanced Bonding Requirement After Initiation of this Action Are at Issue in This Case and Must Be Set Aside as Contrary to Law

   The record demonstrates that certain bond sufficiency determinations affecting plaintiffs were made by Customs according to the enhanced bonding requirement after this case was initiated. For reasons discussed previously in this Opinion and Order, the court concludes that all bond sufficiency determinations that were made on plaintiffs' continuous entry bonds according to the enhanced bonding requirement are contrary to law and must be set aside. Plaintiffs stated in a status conference that they intended to contest all determinations made according to the enhanced bonding requirement, which determinations would include those that Customs made after the complaint was filed in this case. Status Conference Tr. (Confidential) 31, Mar. 28, 2008 (in which plaintiffs stated that they "are challenging any bond determination for the 27 plaintiffs in this case to the extent that those bond determinations were made based on Customs' enhanced bonding practice."). Defendant did not object to plaintiffs' statement that plaintiffs were

contesting all such determinations and, in its communications with plaintiffs and the court, has defended these bond determinations on the merits, expressly or impliedly regarding these determinations as being at issue in this litigation. *Id*. at 35-36. The court rules that the issue of the lawfulness of bond sufficiency determinations that Customs made after the initiation of this action has been litigated by the express or implied consent of the parties. *See* USCIT Rule 15(b)(2).

## III. CONCLUSION

All of the individual bond sufficiency determinations at issue in this case were determined according to the enhanced bonding requirement, which was unlawful in multiple respects. All such determinations, therefore, must be set aside as contrary to law. With respect to bonds on which plaintiffs are principals, and with particular respect to bonds applying to previous time periods, the remedy of setting aside past bond sufficiency determinations is meaningless absent the cancellation of the bond, either with or without replacement by a superseding bond. The court has structured a remand proceeding to provide for the relief to which plaintiffs are entitled, with respect to their current and their previous bonds.

## ORDER

Based on the court's consideration of the entire record in this case and all papers and proceedings herein, and after due deliberation, it is hereby

**ORDERED** that the enhanced bonding requirement be, and hereby is, set aside as arbitrary, capricious, and otherwise not in accordance with law; it is further

**ORDERED** that all of plaintiffs' individual bond sufficiency determinations that were made according to the enhanced bonding requirement be, and hereby are, set aside as arbitrary, capricious, and otherwise not in accordance with law; it is further

**ORDERED** that the individual bond sufficiency determinations at issue in this action are remanded to Customs for redetermination during a period of sixty (60) days beginning with the date of this Opinion and Order (the "remand period"), during which remand period Customs shall effect, in accordance with this Opinion and Order, an individual redetermination of the limit of liability on each individual continuous entry bond at issue in this action without application of the enhanced bonding requirement unless it chooses to cancel all liability on a bond outright, as provided in this Opinion and Order; it is further

**ORDERED** that Customs, in accordance with this Opinion and Order, shall accomplish each individual bond redetermination under this Opinion and Order for the purpose of allowing a plaintiff who is a principal on a bond to replace that bond with a superseding bond at a limit of liability that was not determined according to the enhanced bonding requirement, regardless of whether such bond is a current bond or a bond applying to a previous time period; it is further

**ORDERED** that pursuant to the preceding paragraph, Customs, during the remand period or during a reasonable time thereafter, shall cancel each of plaintiffs' bonds that have a liability limit determined according to the unlawful enhanced bonding requirement, with or without accepting a superseding bond as a replacement for the bond to be canceled, except as provided specifically in this Opinion and Order; it is further

**ORDERED** that Customs, without prior approval of the court, shall allow upon remand the replacement of any bond with a superseding bond with a limit of liability that is determined during the remand period according to this Opinion and Order if such superseding bond is obtained pursuant to a redetermination of sufficiency that is now acceptable to the plaintiff who is a principal on the bond to be replaced; it is further

**ORDERED** that Customs, in its discretion and without the prior approval of the court, may determine during the remand period that a bond at issue in this case may be canceled without the need for replacement with a superseding bond and proceed to cancel such bond; it is further

**ORDERED** that any plaintiff who contests an individual redetermination of sufficiency for a bond on which such plaintiff is the principal that is effected by Customs during the remand period may file with the court comments setting forth its objections to the bond sufficiency redetermination; it is further

**ORDERED** that any bond sufficiency determination pertaining to a plaintiff that Customs already has made pursuant to consultations conducted during litigation of this action or pursuant to the *Enhanced Bonding Requirement for Certain Shrimp Importers*, 74 Fed. Reg. 1224 (Jan. 12, 2009) or the *Enhanced Bonding Requirement for Certain Shrimp Importers*, 74 Fed. Reg. 14,809 (Apr. 1, 2009) shall suffice to satisfy the obligation imposed by this Opinion and Order to redetermine a prior bond sufficiency determination, provided such redetermination remains acceptable to such plaintiff; it is further

**ORDERED** that a ruling by the court on plaintiffs' motion for injunctive relief be, and hereby is, held in abeyance pending the court's ruling on the results of the remand proceeding ordered by the court; it is further

**ORDERED** that the preliminary injunction entered by the court pursuant to the Order of November 13, 2006 remains in effect, except that no provision in the Order of November 13, 2006 shall be construed to prevent Customs from complying in full with the requirements of the remand specified in this Opinion and Order; and it is further

**ORDERED** that defendant shall file with the court, within sixty (60) days of the date of this Opinion and Order, the results of its redeterminations upon remand and plaintiffs shall file with the court, within thirty (30) days of the filing of defendant's remand results, their comments thereon.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: August 25, 2009
New York, New York